RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0288p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

| | |
|---|---|
| CHELESY EASTEP, as surviving spouse and next of kin of Landon Dwayne Eastep,<br>         *Plaintiff-Appellee*,<br><br>  *v.*<br><br>CITY OF NASHVILLE, TENNESSEE,<br>         *Defendant*,<br><br>BRIAN MURPHY, STEVEN CARRICK, EDIN PLANCIC, SEAN WILLIAMS, JUSTIN PINKELTON, and JAMES KIDD, in their individual and official capacities as officers of the Metropolitan Nashville Police Department (24-5319); FABJAN LLUKAJ, in his individual and official capacity as an officer of the Mt. Juliet Police Department (24-5320); REGGIE EDGE, JR. and CHARLES ACHINGER, in their individual and official capacities as officers of the Tennessee Highway Patrol (24-5341),<br>         *Defendants-Appellants*. | Nos. 24-5319/5320/5341 |

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00721—Waverly D. Crenshaw Jr., District Judge.

Argued: February 6, 2025

Decided and Filed: October 17, 2025

Before: MURPHY, DAVIS, and BLOOMEKATZ, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Melissa Roberge, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellants. David J. McKenzie, THE LAW OFFICE OF DAVID MCKENZIE, Lewisburg, Tennessee, for Appellee. **ON BRIEF:** Melissa Roberge, Michael R. Dohn,

METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Metro Officers Appellants.  Robert M. Burns, Samantha A. Burnett, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellant Llukaj.  Amanda Jordan, Meghan Murphy, Gabriel Krimm, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants Edge and Achinger.  David J. McKenzie, THE LAW OFFICE OF DAVID MCKENZIE, Lewisburg, Tennessee, Barbara G. Medley, MEDLEY AND SPIVY, Lewisburg, Tennessee, for Appellee.

---

**OPINION**

---

DAVIS, Circuit Judge.  A thirty-five-minute standoff on a Nashville highway ended when nine police officers fired roughly thirty-three shots at Landon Eastep.  Twelve shots struck and killed him.  Mr. Eastep's wife, Chelesy Eastep, sued the City of Nashville, the City of Mt. Juliet, and nine officers in these consolidated cases on behalf of her husband's estate.  She seeks relief under 42 U.S.C. § 1983 for violations of her husband's Fourth Amendment right to be free from excessive force.  The officer Defendants moved to dismiss, claiming qualified immunity.  The district court denied their motion, and Defendants appeal.  For the following reasons, we AFFIRM in part and REVERSE in part.

### I.     Background

#### A.   Facts[1]

On January 27, 2022, at approximately 2 p.m., Mr. Eastep walked along the shoulder of Nashville Interstate 65 when he was met by Tennessee State Trooper, Reggie Edge, Jr.  After using Mr. Eastep's driver's license to confirm his identity, Edge advised that he would pat down Mr. Eastep and give him a ride off the interstate.  Prior to conducting the pat down, Edge asked if Mr. Eastep had anything that would "poke" or "harm" him.  (Second Amended Complaint ("SAC"), R. 72, PageID 413); (Edge Dashcam, R. 53-1 at 0:03:54–:56).  Before Edge completed the pat down, Mr. Eastep took a box cutter out of his pocket, briefly held it up, and began to trot

---

[1]We recite the facts as set forth in Mrs. Eastep's SAC and the video footage provided by the parties.  We accept all well-pleaded facts as true to the extent they are not "blatantly contradicted" by video evidence.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  So, we use the video in place of—or as a supplement to—the complaint, only where appropriate.  *See Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).

away only to double back to the area where Edge first encountered him. Edge ordered Mr. Eastep to drop "the weapon" and get down on the ground. (Edge Dashcam, R. 53-1 at 0:04:32–:33). So began a cycle of Edge yelling commands at Mr. Eastep, and Mr. Eastep failing to acknowledge or obey them.

An off-duty officer, Fabjan Llukaj of the Mt. Juliet Police Department, happened to be driving by and noticed the commotion. Llukaj stopped his truck and crossed the highway on foot to assist Edge. He joined Edge in imploring Mr. Eastep to drop (what was perceived to be) "the knife" and to let the officers help him. (*See id*. at 0:07:18–:28). Meanwhile, Edge called for backup. Over the next thirty or so minutes, officers arrived from the Tennessee Highway Patrol and the Metropolitan Nashville Police Department ("Metro"). The standoff that began with Mr. Eastep and Edge grew to a scene with Mr. Eastep facing as many as ten officers with guns drawn.

Several officers asked Mr. Eastep to drop his weapon. Edge flagged to the other officers that he knew Mr. Eastep had a knife, but he never finished the pat down and so Mr. Eastep could have more weapons on him. He also advised that Mr. Eastep appeared to have something in his pocket. Mr. Eastep never answered the officers' inquiries about whether he had another weapon in his pocket or why he was reaching for it. As the officers attempted to reason with him, Mr. Eastep paced around the shoulder of the highway, never responding to their commands to drop his weapon.

Eventually, Mr. Eastep took two quick steps toward the officers. At the same time, he pulled an object from his jacket pocket and pointed it at the officers, leveling it at shoulder height as one would a firearm. Multiple officers opened fire. Within a second, Mr. Eastep fell to the ground. In the five seconds after Mr. Eastep raised the object, the officers fired approximately thirty-three shots at him.

Approximately two seconds after Mr. Eastep fell to the ground, an unidentified officer twice called for a ceasefire. Another officer called for a ceasefire at least once, after shots continued to ring out following the first two calls for ceasefire. After Mr. Eastep already had

been shot multiple times, had fallen to the ground, and other officers had ceased fire, Metro Officer Brian Murphy shot at Mr. Eastep for the first time. He fired two shots.

According to the Tennessee Bureau of Investigations ("TBI") report, of the thirty-three shots, Edge fired his weapon approximately seven or eight times; Metro Officer Sean Williams fired five times; Metro Officer James Kidd fired four times; Metro Officer Justin Pinkelton fired three times; Tennessee Highway Patrolman Charles Achinger and Metro Officer Steven Carrick each fired twice; Llukaj fired once; Metro Officer Edin Plancic fired a personal BCM AR15 six times; and Murphy fired his personal Colt rifle twice. Other than Murphy's two shots after Mr. Eastep was on the ground, it is unclear which officer shot when or when each stopped shooting.

An autopsy report revealed that Mr. Eastep's bullet wounds ranged from his shoulders down to his left leg. Twelve of the shots hit and mortally wounded him. Five bullets entered through Mr. Eastep's back, indicating those bullets potentially struck him after he had already fallen to the ground.

### B.  Procedural History

Mrs. Eastep filed suit against the City of Nashville, the City of Mt. Juliet, Murphy, Carrick, Plancic, Williams, Pinkelton, Kidd, Llukaj, Edge, and Achinger for their actions leading to Mr. Eastep's death. Her SAC governs this appeal. The SAC asserts that the officers used excessive force in violation of Mr. Eastep's Fourth Amendment rights. It also alleges that "every" officer opened fire on Mr. Eastep when he did not pose a threat, ultimately killing him. (SAC, R. 72, PageID 413–15, 421).

All officers moved to dismiss the complaint based on qualified immunity. But the district court denied the motions because it determined that the complaint's allegations, taken as true, establish a plausible Fourth Amendment claim for excessive force and that Mr. Eastep's constitutional right to be free from such force was clearly established. The officer Defendants appeal. In addition to contesting the merits of Defendants' appeal, Mrs. Eastep has moved to dismiss the appeal for lack of jurisdiction and seeks sanctions.

## II.     Jurisdiction

On the question of jurisdiction, Mrs. Eastep contends that the district court's denial of Defendants' motion to dismiss "is not a final decision under 28 U.S.C. § 1291 because the district court's decision does not turn on legal questions." (ECF 28, Appellee's Mot. to Dismiss for Lack of Jurisdiction at 1).

Our jurisdiction extends to appeals from "final decisions." 28 U.S.C. § 1291. Typically, the denial of a motion to dismiss is not a final decision. *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016). However, "a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (citation omitted). Still, "[w]e have jurisdiction only to the extent that the defendant[s] 'limit[] [their] argument to questions of law premised on facts taken in the light most favorable to the plaintiff.'" *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (quoting *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008)). Here, Defendants have adopted Mrs. Eastep's version of facts, except where blatantly contradicted by video evidence. Therefore, we have jurisdiction to consider whether, taking the complaint's allegations as true, qualified immunity applies.[2]

### III.    Standard of Review

We review the district court's decision to dismiss for qualified immunity de novo. *Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466 (6th Cir. 2023). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]e construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright*, 839 F.3d at 518. While our inquiry ordinarily concerns only the four corners of the complaint, we may consider "uncontroverted video evidence" in qualified-immunity cases. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). So where, as here, the parties have submitted video recordings to aid in our

---

[2] We deny Mrs. Eastep's motion to dismiss for lack of jurisdiction in a separate order.

consideration of the motion to dismiss, we can rely on the videos over the complaint if and where "the videos are clear and 'blatantly contradict[]' or 'utterly discredit[]' the plaintiff's version of events." *Id.* (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Heeter v. Bowers*, 99 F.4th 900, 910 (6th Cir. 2024) (recognizing that we may utilize video footage that "accurately depicts most of the relevant events" to "ensure [that] the district court properly constructed the factual record" and resolved the legal questions based on that record). And where the video footage contains any "gaps or uncertainties," we must view those in Mrs. Eastep's favor as well. *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

To overcome Defendants' qualified-immunity defense, Mrs. Eastep "must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right.'" *Courtright*, 839 F.3d at 518 (alteration in original) (quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)).

## IV.   Discussion

Defendants first contend that the district court improperly deferred ruling on qualified immunity until after discovery. Second, they argue that no officer violated Mr. Eastep's clearly established Fourth Amendment right by using deadly force. And third, Defendants claim that even if any officer fired a gratuitous shot, the complaint does not identify which officer fired those excessive shots. So, Mrs. Eastep cannot "justify discovery" against each defendant. (ECF 25, Appellants' Br. at 50).

### A.  The District Court's Ruling

According to Defendants, the district court avoided ruling on qualified immunity, instead allowing litigation to proceed to gain more clarity on the complaint's allegations. And because the district court could only "guess" as to critical facts, like which officers shot after Mr. Eastep fell to the ground, the court should have concluded that the complaint lacked sufficient detail to support its claims. (*Id.* at 34).

By our reading, however, the district court did not eschew ruling on the issue. Instead, at

least provisionally, it determined that the SAC alleged facts sufficient to establish that (1) the officers violated Mr. Eastep's constitutional rights and (2) the violation was of a clearly established right. In particular, the court compared the SAC's allegations to available video footage to consider whether any allegations were blatantly contradicted. The court determined that, affording all reasonable inferences to Mrs. Eastep, it was "plausible" that some or all officers discharged their weapons after the threat justifying deadly force was neutralized. *Eastep v. Metro. Gov't. of Nashville*, No. 22-cv-00721, 2024 WL 1349025, at *5 (M.D. Tenn. Apr. 1, 2024). The court found that video footage did not blatantly contradict the SAC's allegation that "every" officer opened fire on Mr. Eastep, killing him when "he posed no actual threat to" them. *Id.*; (SAC, R. 72, PageID 413–15, 421). It then concluded that shooting Mr. Eastep "when he did not pose a safety threat is unconstitutional." *Eastep*, 2024 WL 1349025, at *5. The district court also determined that that the legal precedent forbidding the use of deadly force against persons who pose no immediate threat is clearly established. *Id.* In doing so, it denied qualified immunity at this stage. *Id.*

We have observed that when a district court determines that a defendant is not entitled to qualified immunity at the pleadings stage, that denial is only "provisional, since the court may revisit the issue on summary judgment—where the court will take as true only the facts as to which the plaintiff has created a 'genuine issue.'" *Sterling Hotels*, 71 F.4th at 467 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). So, in context, we understand the district court's reference to reserving judgment on qualified immunity to be in accordance with *Sterling Hotels*'s guidance to rule provisionally on the question. There is thus no reason to vacate on this basis.

B.  Qualified Immunity

We employ a two-part test to determine whether an officer is entitled to qualified immunity, asking "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

Defendants contend they did not violate Mr. Eastep's clearly established right to be free from excessive force because Mr. Eastep's actions leading up to the shooting justified their use of deadly force. At the very least, Defendants argue that they did not violate any clearly established right against the use of deadly force under the circumstances of this case. Mrs. Eastep argues that deadly force was not justified because "holding a vape in a gun stance is not a threat of serious harm when the officers saw that [Mr. Eastep held] a vape." (ECF 29, Appellee's Br. at 42). And even assuming the officers did not know Mr. Eastep had a vape, shooting him thirty-three times was unreasonable. Mrs. Eastep contends that the district court properly concluded that the SAC plausibly alleges a violation of Mr. Eastep's clearly established rights by pleading that the officers continued to shoot after Mr. Eastep fell to the ground, incapacitated.

Reading the SAC with the video footage as useful context, we analyze Defendants' motion to dismiss much like the district court did. For instance, we agree with the district court that the video evidence "unequivocally shows Eastep withdrawing an object from his pocket, raising it in front of him to about shoulder height, and pointing it towards law enforcement." *Eastep*, 2024 WL 1349025, at *4. And "[o]nly then was Eastep met with a hail of bullets." *Id.* This footage therefore blatantly contradicts the allegation that officers opened fire only because Mr. Eastep reached for his vape.

But the video footage does not blatantly contradict all allegations contained in and reasonable inferences taken from the complaint. Relevant here, the video shows that Murphy, who was the farthest away from the encounter, began shooting *after* other officers made multiple calls for a ceasefire, Mr. Eastep had fallen to the ground, and every other officer had stopped shooting. The video does not reveal which of the eight remaining officers continued shooting after the ceasefire was called—it only shows that as many as ten shots were fired after Mr. Eastep fell and dropped what he had been holding. It is with this understanding of the facts that we assess Mrs. Eastep's excessive-force claim.

1. Constitutional Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A]pprehension by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). We examine whether such a seizure was excessive during "an arrest, investigatory stop, or other 'seizure'" using "the Fourth Amendment's 'objective reasonableness' standard." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Doing so "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted) (quoting *Garner*, 471 U.S. at 8). Three factors guide our consideration of the force's reasonableness: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Baker*, 471 F.3d at 606 (citing *Graham*, 480 U.S. at 396). "[D]eciding whether a use of force was objectively reasonable demands 'careful attention to the facts and circumstances' relating to the incident, as then known to the officer." *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (quoting *Graham*, 490 U.S. at 396). So, these factors do not displace the ultimate inquiry, which is whether the totality of the circumstances justifies the amount of force used. *Id.*

We have "made the threat factor from *Graham* a minimum requirement for the use of deadly force." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). We judge the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We keep in mind the "split-second judgments" police officers are often forced to make in "tense, uncertain, and rapidly evolving" circumstances. *Id.* at 397; *Mullins*, 805 F.3d at 765–66. "[T]he situation at the precise time of the shooting will often be what matters most," but we recognize that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Hodges v. City of Grand Rapids*, 139 F.4th 495, 517 (6th Cir. 2025) (quoting *Barnes*, 605 U.S. at 80).

*The Initial Eight Officers.* Defendants are not all in the same position here. The facts do not suggest that eight of the nine officers—Carrick, Plancic, Williams, Pinkelton, Kidd, Llukaj, Edge, and Achinger—fired their first shots after Mr. Eastep was incapacitated. Instead, the video shows that all eight officers began shooting after Mr. Eastep adopted a shooting stance while pointing an object in their direction and that ten shots rang out after he fell to the ground. The district court employed a "segment-specific inquiry" to determine that the officers' initial shots were objectively reasonable but that the shots fired after Mr. Eastep was incapacitated were not. *Eastep*, 2024 WL 1349025, at *5. Mrs. Eastep similarly relies on cases analyzing officers' actions in discrete intervals to conclude that the Defendants acted unreasonably. *See, e.g.*, *Dickerson v. McClellan*, 101 F.3d 1151, 1161–63 (6th Cir. 1996) (analyzing officers' failure to knock and announce and use of deadly force in "segments"); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (analyzing officers' initial and subsequent use of a taser followed by deadly force as three separate claims).

We can dispose of the first factor in the *Graham* analysis quickly. It is the only factor that does not lean in favor of the officers' use of deadly force. The severity of the crime at issue was low; Edge stopped Mr. Eastep for walking on the shoulder of Interstate 65. Tennessee criminalizes doing so, but only as a Class C misdemeanor—the least serious type of misdemeanor offense in Tennessee. *See* Tenn. Code Ann. § 55-8-127. Such a minor offense would not reasonably justify deadly force.

Turning to the second factor, it was objectively reasonable for the officers to perceive Mr. Eastep's actions as an immediate threat. Contrary to the complaint's allegations, the video footage shows that Mr. Eastep: (1) consistently and repeatedly disobeyed Defendants' commands to drop his weapon; (2) took two steps towards them; (3) quickly removed an object from his jacket pocket; and (4) using both hands, from a shoulder-level position, pointed the object at officers. Taken together, these actions evince a reasonable perception of an immediate threat. *See Simmonds v. Genesee County*, 682 F.3d 438, 441–42, 445 (6th Cir. 2012) (initiating deadly force after the decedent yelled that he had a gun and pointed a metal object threateningly at the officers); *Pollard v. City of Columbus*, 780 F.3d 395, 400, 403 (6th Cir. 2015) (initiating lethal

force when the decedent reached down into his car and then clasped his hands in a shooting position).

In *Barnes*, the Court rejected the "moment-of-threat rule" for assessing reasonableness—which focuses solely on the facts presented at the moment of the threat—because that rule limited courts' view to a specific timeframe and thus accepted a framework in tension with the totality of the circumstances. 605 U.S. at 79–81. Following *Barnes*, some have suggested that the demise of the moment-of-threat rule was likewise a death knell to more narrow applications of the "segmented approach" on which Mrs. Eastep may partially rely. *See, e.g.*, *Hodges*, 139 F.4th at 517; *Feagin v. Mansfield Police Dept.*, ___ F.4th ___, 2025 WL 2621665, at *9–10 (6th Cir. Sept. 11, 2025) (collecting cases). But we need not weigh in on that question because considering Mr. Eastep's threat within the totality of the circumstances, all but the last shots fired by Murphy—discussed more fully below—were objectively reasonable.

Recognizing the "split-second judgments" that the eight officers had to make under the circumstances here, Mrs. Eastep has not sufficiently alleged a constitutional violation for these officers. *See Graham*, 490 U.S. at 397. The video shows that the eight officers began to fire only after Mr. Eastep took threatening steps toward them, removed an object from his pocket, and pointed it at the officers from a shoulder-level position. The officers continued to shoot for about five seconds as Mr. Eastep fell to the ground and eventually stopped moving. But because it was objectively reasonable to use deadly force at the time the officers initiated their fire, and the officers quickly registered and heeded the call for a ceasefire once Mr. Eastep was subdued, we need not parse the few ticks of the clock that spanned the continuous shooting to determine the reasonableness of the officers' actions here. The encounter with Mr. Eastep was "tense, uncertain, and rapidly evolving," thereby rendering the officers' conduct objectively reasonable. *See id.*

Finally, Mr. Eastep's attempts to actively resist or evade arrest weigh in favor of the use of deadly force. Active resistance occurs where "some outward manifestation—either verbal or physical . . . suggest[s] volitional and conscious defiance." *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). Virtually from the outset of the encounter, Mr. Eastep refused to comply

with the officers' requests for him to drop his weapon and rejected their efforts to get him off the freeway. He had already tried to evade Edge by pulling away from him, nearly stepping into a traffic lane, and jogging further up the freeway shoulder. As additional officers arrived and repeatedly asked Mr. Eastep to drop his weapon, he refused to do so and continued to walk along the shoulder instead. This lack of cooperation alone would not justify the use of deadly force. *See Eldridge*, 533 F. App'x at 535 ("[N]oncompliance alone does not indicate active resistance; there must be something more."); *Sevenski v. Artfitch*, Nos. 21-1391/1402, 2022 WL 2826818, at *4 (6th Cir. July 20, 2022) (concluding that disobeying officers' orders by walking towards them "is not the same as active resistance"). But the video footage shows that Mr. Eastep's actions went beyond mere non-compliance when he moved towards the officers, drew an object from his pocket, and mimicked a shooting stance as he pointed the object at the officers. *See Kapuscinski*, 821 F. App'x at 612 (holding that Kapuscinski's actions constituted a "deliberate act of defiance using one's own body" where he refused to roll over and attempted to stand up (quoting *Eldridge*, 533 F. App'x at 535)); *Puskas v. Delaware County*, 56 F.4th 1088, 1096 (6th Cir. 2023) (finding that Puskas resisted arrest by "repeatedly disobey[ing] the officers' orders to come to them and to leave everything on the ground" and then attempting to flee).

Because the SAC did not sufficiently allege that the eight officers acted unreasonably, we need not determine whether the law was clearly established with respect to the eight officers' actions.

*Officer Murphy.* Our analysis of the second and third *Graham* factors differs for Murphy—whose *initial* shots came after Mr. Eastep was incapacitated and every other officer had stopped shooting. With this added circumstance in mind, Mrs. Eastep has alleged facts sufficient to support a plausible claim that Murphy's use of deadly force was objectively unreasonable.

"[T]he use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker*, 471 F.3d at 607 (collecting cases). At that point, the suspect no longer poses "an immediate threat to the safety of the police officers or others." *Id.* at 606. And "the legitimate government interest in the application of significant force dissipates." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 404–05 (6th Cir. 2009); *see also Gambrel v. Knox*

*County*, 25 F.4th 391, 402 (6th Cir. 2022) (concluding that if the jury credited testimony that officers tased the suspect many times and repeatedly hit him in the face with a flashlight and baton, "it would show the type of 'gratuitous' violence that runs afoul of the Fourth Amendment" (citation omitted)).

In *Baker*, we considered the same officer's conduct towards two suspects, Troy Baker and Jesse Snader, on different occasions. After Baker held his hands up in the "surrender position," the officer struck Baker in the head with his asp and knocked him to the ground. 471 F.3d at 607. The officer then struck Baker again in the knee and told him "[t]hat's for running from me." *Id.* (alteration in original). We concluded that, because the officer had neutralized any threat that Baker posed to him, the officer's strike to Baker's knee was "unjustified and gratuitous." *Id.* Similarly, after the officer told Snader that he would shoot him if he did not stop, Snader told him that he was slowing down. *Id.* at 608. The officer then struck Snader in the head with his asp, tackled him, and sat on his back with a chokehold. *Id.* We determined that the officer's blow to Snader's head was "gratuitous" because the jury could find that Snader was surrendering. *Id.* at 609; *see also Russo*, 953 F.2d at 1045 (holding that genuine disputes of fact existed over whether the "second and third round of discharges" were excessive because the suspect "posed no serious threat of physical harm" by that point).

Here, we similarly have the use of gratuitous force, indeed lethal force, initiated after the threat was neutralized, and the individual was incapacitated. True, Murphy shot Mr. Eastep only three seconds after he no longer posed a threat. But determining an officer's reasonableness in deploying deadly force is highly fact dependent. *See Graham*, 490 U.S. at 396; *Barnes*, 605 U.S. at 80. The complaint plausibly alleges that Murphy did not start shooting Mr. Eastep until after he already had been incapacitated. The video depicts Eastep unmoving, on the ground, and no longer holding an object when the last two shots are fired. Considering the second *Graham* factor in light of the complaint's allegations and the video, the surrounding officers, including Murphy, faced no immediate threat. Therefore, the facts plausibly support Mrs. Eastep's claim that it was not objectively reasonable for Murphy to use deadly force against Mr. Eastep.

Citing *Mullins* and *Untalan*, Defendants contend there is a five-second rule permitting officers to use deadly force in response to a reasonably perceived threat of an immediate harm

without any need to reassess the danger. But we have not articulated—and do not intend to articulate today—such a bright-line rule. In both of those cases, we found that the reasonable perception of a continued presence of a threat justified a subsequent volley of shots after the suspect was apparently incapacitated.

In *Mullins*, for example, an officer and a suspect engaged in a physical struggle, and the suspect pulled his gun. 805 F.3d at 763. After tussling with the officer for a period, the suspect drew his gun and had his finger on the trigger and then threw the gun over the officer's shoulder, seemingly surrendering it. *Id.* at 763–64. But the officer, who was without backup, fired two shots at the suspect within five seconds, striking him once and killing him. *Id.* at 764. The quick succession of events did not justify the use of force, alone. Instead, we considered that the altercation had already been physical, *id.* at 766, the suspect's finger was on the trigger, *id.* at 767, the altercation happened in the early evening hours—suggesting non-ideal lighting, *id.*, and the incident transpired in a busy location—suggesting the officer was in an uncontrolled environment, *id.* We also repeatedly emphasized that the officer's "second shot came within the time frame in which a reasonable officer could have acted under the perception that Mullins was still armed." *Id.* at 768. The totality of the circumstances, not a bright-line timing rule, justified the officers' use of force.

Similarly, in *Untalan*, an officer fatally shot the suspect as he attacked the officer's partner with a butcher's knife. 430 F.3d at 313–14. Just after the officer's partner wrestled away the knife, the officer fired a single shot that struck Untalan in the upper chest. *Id.* The entire altercation lasted "a few seconds," but witnesses characterized only a "split second" between the suspect dropping a knife and the officer's single shot. *Id.* at 315. So, while we did determine that, in that case, the officer's split-second decision to shoot the suspect was reasonable, we established no five-second rule for law enforcement to continue using deadly force without determining whether the target still poses a threat. Indeed, not even five seconds passed between the suspect dropping the knife and the officer shooting.

Contrary to Defendants' assertions, these cases reiterate that the totality of the circumstances is what matters. *See Mullins*, 805 F.3d at 765; *Untalan*, 430 F.3d at 317. And that inquiry "has no time limit." *Barnes*, 605 U.S. at 80. Nothing in our case law gives an officer

free range to shoot, carte blanche, after other officers have neutralized the threat.  We have stated quite the opposite: "[T]he Fourth Amendment prohibits officers from using 'gratuitous' force that is unnecessary to effectuate the arrest of a person who has ceased resisting." *Gambrel*, 25 F.4th at 402 (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)).  And the complaint plausibly alleges that Murphy fired two shots after Defendants eliminated any earlier threat Mr. Eastep posed.

The lack of a continuing threat is bolstered by the fact that two officers had called for a ceasefire and therefore expressly announced the resolution of any threat before Murphy fired his shots.  Murphy had not even shouldered his weapon until after Mr. Eastep collapsed.  Yet Murphy counters that his use of force was justified because Kidd's bodycam footage shows that Mr. Eastep raised his arm just before Murphy twice fired his rifle.  Murphy insists that a reasonable officer would have perceived a continuing threat based on this movement, citing *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000), for support.  But *Boyd* does not permit officers to use deadly force simply because their target is moving.  In that case, "Boyd remained on the loose, apparently still armed, and potentially dangerous." *Id.* at 602.  After having already been shot at and on the ground, Boyd lifted his torso and aimed a gun at officers. *Id.* at 603.  The officers fired at least seven more times until Boyd dropped his weapon, killing him. *Id.*

Mr. Eastep had been on the ground, unmoving, for three seconds when Murphy shot him.  The complaint alleges that Mr. Eastep was "clearly incapacitated."  (SAC, R. 72, PageID 417).  True, Mr. Eastep's arm moved slightly after Murphy fired his first shot.  But it is difficult to interpret the motion as threatening.  His torso remained flat on the ground, and his movement appears involuntary because of the gunfire.  Mr. Eastep at that point had no weapon in his hand, let alone a weapon pointed at the officers. *Cf. Boyd*, 215 F.3d at 603.  In any event, Mr. Eastep's movements on the ground were too ambiguous from the video footage to blatantly contradict Mrs. Eastep's version of events.  So, we accept the complaint's allegation that Mr. Eastep was incapacitated and from that infer that any movements were involuntary.  After all, on a motion to dismiss, "the factual allegations in the complaint are not in dispute—the legal sufficiency of the complaint is." *Hodges*, 139 F.4th at 511.

Viewing the pleaded facts and every reasonable inference in the light most favorable to

Mrs. Eastep, it remains plausible that Murphy fired at Mr. Eastep after he fell to the ground and posed no apparent threat. The pleaded allegations, if true, call into question whether a reasonable officer would have perceived Mr. Eastep as an ongoing threat after he fell and lay on the ground barely moving. It may be that Mrs. Eastep is unable to substantiate the allegations. Discovery may show that the events escalated too quickly, and that Murphy did not have a moment to reassess whether Mr. Eastep posed an ongoing threat. But we have not established a bright-line rule determining how much time must pass before we expect officers to reassess the situation after the threat has been neutralized. Because Mrs. Eastep has plausibly alleged that Murphy should have registered that the threat abated when Mr. Eastep fell, she has met the first portion of her burden for surviving Murphy's qualified-immunity defense.

### 2. Clearly Established Law

To survive Murphy's motion to dismiss, Mrs. Eastep still must establish that Murphy's plausible violation of Mr. Eastep's Fourth Amendment rights was clearly established. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Though a plaintiff need not point to a case on all fours with the instant fact pattern to form the basis of a clearly established right, there must be a sufficiently analogous case (or cases) from which a reasonable official would understand that what he is doing violates that right." *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023) (citation modified). The idea is to ensure officers have a "fair and clear warning" that certain conduct violates the law. *Heeter*, 99 F.4th at 915 (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam)). And, in the spirit of giving fair notice of conduct deemed to violate a constitutional right, unpublished decisions will not suffice to show that a right is clearly established. *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002).

As a general matter, "the right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). And narrowing in on the conduct at issue in this case, this court has held that "an unarmed and nondangerous

suspect has a constitutional right not to be shot by police officers." *Gambrel*, 25 F.4th at 406 (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008)).  Moreover, "[w]e have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker*, 471 F.3d at 607 (citing *Shreve*, 453 F.3d at 687); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004); *Gambrel*, 25 F.4th at 402–03 (collecting cases).  Here, Mrs. Eastep alleges that each shot fired by the officers is excessive as a matter of law.  While the video shows that eight of the officers' shots were justified by Mr. Eastep's threat of force and resistance, Murphy's shots after he collapsed were plausibly gratuitous under our case law.  Whether Murphy had sufficient time to perceive that Mr. Eastep's threat of force dissipated after he had been on the ground for three seconds is a question of fact.  But we take the complaint's allegations as true at the pleading stage.  *Hodges*, 139 F.4th at 504.  Those allegations say three seconds was sufficient time for Murphy to realize that Mr. Eastep no longer posed a threat, and his failure to do so violated Mr. Eastep's clearly established rights.  *See Baker*, 471 F.3d at 607, 609; *Russo*, 953 F.2d at 1045.

Combatting this conclusion, Defendants point to cases they contend undermine the existence of any clearly established right under these circumstances.  But those cases do not help Defendants.  Start with *Simmonds*.  There, officers confronted a mentally unstable suspect who they knew was potentially armed, would not show his hands and exit his truck when asked by the officers, attempted to flee, threatened the officers, and brandished a silver object.  *Simmonds*, 682 F.3d at 445.  The suspect pointed that object at the officers as if it were a weapon, and one officer immediately fired several shots at him.  *Id.* at 442.  We found the officer's use of force reasonable because "all of the information available to the officers *at the time they used force* constituted probable cause that [the suspect] 'pose[d] a threat of serious physical harm.'"  *Id.* at 445 (second alteration in original) (emphasis in original) (quoting *Garner*, 471 U.S. at 11).  Thus, *Simmonds* does not unsettle our precedent establishing that the "use of force *after* a suspect has been incapacitated or neutralized is excessive as a matter of law."  *Baker*, 471 F.3d at 607 (emphasis added).

Next, consider *Pollard*.  There, the suspect led officers on a police chase, ending in the suspect colliding with a semitrailer.  *Pollard*, 780 F.3d at 399.  After reaching down and

searching for something on the car's floorboards, the suspect "extended his arms and clasped his hands into a shooting posture, pointed at the officers." *Id.* at 400 (footnote omitted). The suspect did this again, and roughly eight seconds after the suspect's initial shooting-posture movement, two officers shot at him for about three seconds. *Id.* Officers then raced toward the car. During that time, the suspect repeated the same reach-down-and-point sequence; five officers shot this time, fifteen seconds after the initial shots. *Id.* We found both volleys of shots justified because "the totality of the circumstances clearly gave the officers probable cause to believe" that the suspect "threatened their safety." *Id.* at 403. Indeed, even after the initial round of shots, the suspect's "sudden movement" forced them to "quickly assess the threat [he] posed and to quickly conclude that [he] posed a threat even in his injured, immobilized state." *Id.* at 403–04. That, again, does not undermine the clearly established right.

Defendants lastly offer an unpublished case, *Lemmon v. City of Akron*, 768 F. App'x 410 (6th Cir. 2019). In *Lemmon*, officers responded to a reported aggravated robbery and followed the suspect on his bicycle. *Id.* at 412. The officers noticed that the suspect appeared to be concealing something under his coat. *Id.* After the officers pulled the suspect over, the suspect refused to show his hands and threatened the officers. *Id.* at 412–13. The suspect made a quick movement toward an officer who shot him "four times in rapid succession." *Id.* at 413. We found the use of force justified because, "*at the moment of the standoff*," the suspect posed an immediate threat of safety to the officers. *Id.* at 415 (emphasis in original).

The only relevant point *Simmonds*, *Pollard*, and *Lemmon* have in common is that they allow officers to respond to an imminent threat of serious bodily harm with deadly force. These cases say nothing about whether an officer is justified in shooting at a suspect when he no longer poses such a threat. But *Baker* does. Although *Baker* involved blows to the knee and head rather than gunshots, its holding remains true. Baker and Snader had surrendered when the officer struck them with his asp, which could lead a reasonable jury to conclude that the officer's conduct was "unjustified and gratuitous." 471 F.3d at 607, 609. Here, Murphy twice shot Mr. Eastep after he was incapacitated, and every other officer had stopped shooting. Thus, Mrs. Eastep has sufficiently alleged that Murphy's conduct was gratuitous. If *Baker* puts a reasonable officer on notice that he cannot strike a suspect with an asp after the suspect no longer poses a

threat, a reasonable officer should understand that it is a constitutional violation to begin *shooting* the suspect after he no longer poses a threat.

At the motion to dismiss stage, the complaint has plausibly alleged that Murphy fired at Mr. Eastep after any safety threat dissipated entirely. And, as discussed above, our case law clearly establishes that Murphy is *not* justified in using deadly force "after a suspect has been incapacitated or neutralized." *Baker*, 471 F.3d at 607; *cf. Margeson v. White County*, 579 F. App'x 466, 472 (6th Cir. 2014) ("[A] jury could certainly conclude that shooting a man 43 times, including at least 12 shots after he had fallen to the ground, amounts to an unreasonable and excessive use of force."). By plausibly alleging that Murphy's two shots after Mr. Eastep fell to the ground were excessive, the complaint states a claim for a violation of Mr. Eastep's clearly established constitutional rights.

### C.  Individual Liability

Given our conclusion that all Defendants except for Murphy are entitled to qualified immunity, we consider Defendants' argument that the complaint fails to allege facts that each individual officer "actively participated in the use of excessive force" only as to Murphy. *Pollard*, 780 F.3d at 402 (citation omitted). Defendants correctly point out that "[w]e must analyze separately whether [Mrs. Eastep] has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011). But we have determined that the SAC does not plausibly allege that the use of force by eight of the nine officers was objectively unreasonable. To the extent Defendants suggest that Mrs. Eastep has not sufficiently alleged facts against Murphy, we agree with the district court that Mrs. Eastep adequately alleged that Murphy did not begin shooting until after Mr. Eastep was incapacitated. Therefore, the SAC plausibly alleges individual liability as to Murphy.

### V.  Conclusion

We AFFIRM in part and REVERSE in part.